Edna STRAUS, Plaintiff,

v.

HOLIDAY INNS, INC., Smith Barney Harris Upham & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Kemmons Wilson, Walkem Development Company, Inc., Wallace E. Johnson and Ernest B. McCool, Defendants.

No. 77 Civ. 383.

United States District Court, S. D. New York.

April 4, 1978.

Philips & Mushkin, New York City, for plaintiff.

Cadwalader, Wickersham & Taft by John J. Walsh, Earl H. Nemser, Richard H. Walker, New York City, for defendant Holiday Inns.

Davis, Polk & Wardwell, New York City, for Merrill Lynch.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

Plaintiff Edna Straus has commenced this action pursuant to § 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, § 10(b) of the Securities Exchange Act of 1934, ("Exchange Act"), 15 U.S.C. § 78j(b), and principles of common law fraud. Jurisdiction is premised upon § 22(a) of the Securities Act, 15 U.S.C. § 77v, § 27 of the Exchange Act, 15 U.S.C. § 78aa and principles of pendent jurisdiction. This case involves allegedly misleading statements and omissions in a registration statement filed for the purpose of a public offering of common stock held by various controlling persons of defendant Holiday Inns, Inc. ("Holiday").

Plaintiff purports to sue on behalf of a class consisting of all persons who purchased shares in Holiday in the period from March 23, 1976, the effective date of the registration, until April 27, 1976 either pursuant to the prospectus or on the open market. Shortly after plaintiff moved for an order certifying the class pursuant to Rule 23(c)(1), Fed.R.Civ.P., defendants Holiday, Walkem Development Company, Inc.

("Walkem"), Kemmons Wilson, Wallace E. Johnson, and Ernest B. McCool moved for an order: 1) requiring plaintiff to furnish an undertaking in the amount of $100,000 as security for their costs of defending this action, pursuant to § 11(e) of the Securities Act, 15 U.S.C. § 77k(e); 2) staying all discovery in the action pending the determination of their motion for an undertaking pursuant to Rule 26(c), Fed.R.Civ.P.; and 3) staying any ruling on plaintiff's motion for class certification pending the determination of their undertaking motion pursuant to Rule 23(d), Fed.R.Civ.P. Defendants Smith Barney, Harris Upham & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc., underwriters for the public offering in question, joined the other defendants in requesting that a response to plaintiff's class certification motion be deferred pending the determination of the motion for an undertaking. Plaintiff then cross-moved for an order staying all discovery of plaintiff until her class action motion has been decided. For the reasons stated below, defendants' motion for an undertaking is granted. All defendants are directed to respond to plaintiff's class certification motion within 20 days of plaintiff's posting of the undertaking or her notice to all parties and this court of her intent to discontinue her § 11 claim. All discovery concerning matters other than class certification is stayed pending the resolution of the class certification motion.

### Allegations of the Complaint

Defendant Holiday is a large multinational corporation of which the principal operations involve food and lodging, transportation, and the manufacture and sale of furnishings and equipment. In early March 1976, Holiday filed with the Securities and Exchange Commission ("SEC") a registration statement with respect to 1,130,000 shares of common stock to be offered to the public by defendants Walkem (1,000,000 shares) and Johnson (130,000 shares). Defendants Johnson, Wilson and McCool were directors and officers of Holiday and together owned virtually all of the stock of Walkem, a corporation which prior to the sales made pursuant to the March 1976 offering owned 1,672,976 shares of Holiday common.

Both the registration statement, and the prospectus contained Holiday's comparative statements of income for the five fiscal years ending January 2, 1976 and its balance sheets for the dates of January 3, 1975 and January 2, 1976. Plaintiff alleges that on or about March 23, 1976, in reliance upon the prospectus of that date, she purchased 100 shares of Holiday at a price of $16.75 per share.

Holiday's first fiscal quarter for 1976 ended on April 2. On April 27, Holiday made its first announcement of earnings for the first quarter showing net income after taxes of approximately $2 million, or $.07 per share, as compared to approximately $6 million, or $.20 per share, for the comparative quarterly period ending April 4, 1975. Plaintiff alleges that each of the defendants knew, or was on notice of and recklessly disregarded, facts indicating that the March 23, 1976 prospectus[1] was materially false and misleading in its failure to disclose that: a) earnings and earnings per share for the first quarter of 1976 would be only about one-third of those for the comparative quarter of 1975; b) operating costs and expenses for Holiday's "Hospitality Group" for the first quarter of 1976 would increase by $1.2 million as compared to the first quarter of 1975, whereas that group's revenues would increase by only $.5 million for those periods; c) operating costs and expenses for Holiday's "Products Group" would increase by about $3.9 million in the first quarter of 1976 as compared to the first quarter of 1975, whereas revenues for that group increased by only $3.6 mil-

---

1. The complaint is somewhat carelessly drafted. Plaintiff complains of misstatements and omissions in the prospectus, but § 11 only reaches misstatements and omissions in a registration statement. See 15 U.S.C. § 77k(a). In light of plaintiff's allegation that the prospectus "was part of [the registration]", Complaint, ¶ 21, the court will treat the complaint as stating a § 11 cause of action.

lion for those periods; d) operating costs and expenses for Holiday's "Transportation Group" would increase by about $8.6 million for the first quarter of 1976 as compared to the first quarter of 1975; e) operating costs and expenses for the Transportation Group for the first quarter of 1976 would exceed revenues by $1.2 million, whereas revenues exceeded cost and expenses by $6.7 million for that group in the first quarter of 1975; and f) in every major area of Holiday's operations, the results for the first quarter of 1976 were materially less favorable than for the first quarter of 1975.

Count I of the Complaint alleges that defendants' actions violated § 11 of the Securities Act and § 10(b) of the Exchange Act. Count II alleges that defendants' acts constituted common law fraud.

### Defendants' Motion for an Undertaking

■■■ Section 11(a) of the Securities Act provides for civil liability for misstatements or omissions in a registration statement. 15 U.S.C. § 77k(a). Issuers, directors, underwriters, signatories to the registration statement and professionals whose reports or valuations are used in connection with it may all be found liable for these misstatements or omissions subject to the detailed affirmative defenses contained in § 11(b), 15 U.S.C. § 77k(b). *See Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544, 575–83 (E.D.N.Y.1971); *Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643, 682–706 (S.D.N.Y.1968). In contrast to § 10(b) of the Exchange Act, liability for the violation of § 11 may lie for wholly negligent conduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■■■ Section 11(e) states in pertinent part:

In any suit under this or any other section of this subchapter the court may, in its discretion, require an undertaking for the payment of the costs of such suit, including reasonable attorney's fees, and if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant (whether or not such undertaking has been required) if the court believes the suit or the defense to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit, such costs to be taxed in the manner usually provided for taxing of costs in the court in which the suit was heard.

15 U.S.C. § 77k(e). This portion of § 11(e) was not part of the Securities Act as originally enacted, Act of May 27, 1933, c. 38, § 11(e), 48 Stat. 83, but was added to the section by amendments adopted as part of the Exchange Act. Act of June 6, 1934, c. 404, § 206(e), 48 Stat. 907. Although this provision permits the imposition of costs or the requirement of an undertaking of either plaintiffs or defendants, among Congress's principal purposes in enacting this section was to deter the bringing of meritless actions solely for the purposes of procuring a favorable settlement. *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 211 n. 30, 96 S.Ct. 1375, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740–741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see* 78 Cong. Rec. 8669 (1934) (remarks of Senator Fletcher).

■■■ Although § 11(e) speaks in terms of "discretion," the courts of this Circuit have consistently interpreted it to require a specific finding that the action is brought in "bad faith" or is so utterly lacking in merit as to "border on the frivolous." *Klein v. Shields & Co.*, 470 F.2d 1344, 1347 (2d Cir. 1972); *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1056 (2d Cir. 1969); *Linchuck v. Cooper*, 43 F.R.D. 382, 384 (S.D.N.Y.1967). An application for an undertaking generally "is not looked upon with favor." *Lerner v. Ripley Co.*, [1961–1964] Fed.Sec.L.Rep. (CCH) ¶ 91,249, at 94,127 (S.D.N.Y.1963). See 3 L. Loss, Securities Regulation 1838 (2d ed. 1961).[2]

■■■ The prevailing standard is generally stated in alternative form: defendants

---

**2.** Plaintiff contends that the case of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct.

2140, 40 L.Ed.2d 732 (1974) precludes this court from making *any* preliminary inquiry into

must show either that the plaintiff has commenced her suit in bad faith or that her claim borders on the frivolous. The defendants concede that plaintiff has not commenced this action in "bad faith." Thus, the sole issue remaining is whether plaintiff's claim "borders on the frivolous." This standard is not easy to apply, *Katz v. Amos Treat & Co., supra,* 411 F.2d at 1056, for it requires the court to make some evaluation

the merits of this suit. In *Eisen,* the Supreme Court held, *inter alia,* that a preliminary inquiry into the merits of an action to determine whether it may properly be maintained as a class action is prohibited under Rule 23, Fed.R. Civ.P. 417 U.S. at 177–78. The instant motion, however, concerns the propriety not of certifying a class under Rule 23 but of requiring an undertaking under § 11(e). On its face, § 11(e) invites the preliminary inquiry which *Eisen* states that Rule 23 forbids, and it is plainly mistaken to suggest that *Eisen* prohibits such an inquiry in a § 11 case merely because the plaintiff seeks to represent a class.

The defendants argue, however, that the Supreme Court's opinions in *Ernst & Ernst v. Hochfelder, supra,* and *Blue Chip Stamps v. Manor Drug Stores, supra,* compel the application of a less stringent standard than "bad faith" or "bordering on frivolity." In *Blue Chip Stamps,* the Supreme Court held that the plaintiff class for the purposes of the implied private damage action pursuant to § 10(b) of the Exchange Act is limited to purchasers and sellers of securities. 421 U.S. at 731, 95 S.Ct. 1917. One of the policy justifications offered by the Court for its result was the recognition that

> in the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.

*Id.* at 740, 95 S.Ct. at 1927. The Court contrasted the availability of the undertaking-for-costs provision in § 11(e), "uniformly regarded as designed to deter 'strike' or nuisance actions," *id.* at 741, 95 S.Ct. at 1928, with the absence of any such provision in § 10(b), and concluded that "that fact alone justifie[d] our consideration of such potential [for nuisance suits] in determining the limits of the class of plaintiffs who may sue in an action wholly implied from the language of the 1934 Act." *Id.*

In *Ernst & Ernst v. Hochfelder, supra,* the Court held that a private plaintiff may not recover damages for violations of § 10(b) absent the allegation and proof of scienter, the intent to defraud. 425 U.S. at 193, 96 S.Ct. 1375. The Court noted that the express civil remedies in the Securities Act which permitted recovery for merely negligent conduct, including § 11, were "subject to significant procedur-al restrictions not applicable under § 10(b)", including § 11(e)'s security-for-costs provision. 425 U.S. at 209, 96 S.Ct. at 1388. Reasoning that Congress had purposefully qualified its grant of private damage remedies for negligent wrongdoing with such procedural safeguards, the Court determined that Congress intended to limit § 10(b)'s scope to intentional wrongdoing. *Id.* at 210, 96 S.Ct. 1375. In a footnote, the Court stated of § 11(e):

> One of its purposes was to deter actions brought solely for their potential settlement value . . . (citations omitted) This deterrent is lacking in the § 10(b) context, in which a district court's power to award attorney's fees is sharply circumscribed. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, [95 S.Ct. 1612, 44 L.Ed.2d 141] (1975) ("bad faith" requirement); *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, [94 S.Ct. 2157, 40 L.Ed.2d 703] (1974).

425 U.S. at 211 n. 30, 96 S.Ct. at 1389.

The new § 11(e) standard which the defendants extrapolate from *Blue Chip* and *Hochfelder* is as follows: if a complaint, considered by objective standards, presents a possibility of vexatious litigation because it appears to have little chance of success at trial, then a court should exercise its discretion to require the plaintiff to post a bond for the payment of defendants' costs and expenses. Neither *Blue Chip* nor *Hochfelder,* however, compels the application of such a standard. In these cases the Supreme Court viewed Congress's express grant to the federal courts of a discretionary power under § 11(e) to impose costs and require undertakings as indicative of its intent to limit the scope of the implied private remedy under § 10(b). The Court made no attempt to delineate the standards by which a court's discretion under § 11(e) should be guided. Thus, every court which has had the opportunity to construe § 11(e) since *Blue Chip* and *Hochfelder* has adhered to the "bad faith—bordering on the frivolous" construction. *See, e. g., Shaw v. Merritt-Chapman & Scott Corp.,* 554 F.2d 786, 788 (6th Cir. 1977); *Jackson v. Oppenheim,* 533 F.2d 826, 831 (2d Cir. 1976) (dictum); *Aid Auto Stores, Inc. v. Cannon,* 525 F.2d 468, 471 (2d Cir. 1975); *Klepper Krop, Inc. v. Hanford,* 411 F.Supp. 276, 281 (D.Neb.1976); *Miller v. Schweikart,* 413 F.Supp. 1059, 1061–62 (S.D.N. Y.1976). This court declines to do otherwise.

of the factual and legal barriers to plaintiff's recovery.[3] *Klein v. Shields & Co., supra*, 470 F.2d at 1347.

The principal legal barrier to plaintiff's recovery, defendants argue, is her attempt to impose liability upon them for failing to forecast in the March 23rd registration statement what Holiday's performance for the fiscal quarter ending April 2, 1976 would be. Defendants contend that they were under no such obligation as a matter of law and, therefore, that the complaint's theory of recovery "borders on the frivolous."

The law as to the disclosure of financial projections is in a state of flux. *See generally* R. Jennings & H. Marsh, Securities Regulation 921–26 (4th ed. 1977). Section 11(a) imposes liability for the failure to disclose material "facts", 15 U.S.C. § 77(a), and, until recently, both the courts and the SEC sharply distinguished between "facts" —which had to be disclosed—and "projections"—which could never be. *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1291–98 (2d Cir. 1973) (asset appraisals need not be disclosed, firm offers to purchase assets must be); *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) ("the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data"); *Union Pac. R. R. v. Chicago & N. W. Ry.*, 226 F.Supp. 400, 408–09 (N.D.Ill. 1964); SEC, Securities Act Release No. 5180 in [1970–1971] Fed.Sec.L.Rep. (CCH) ¶ 78,-192, at 80,579 (Aug. 16, 1971) ("care should be exercised so that . . . predictions, projections, forecasts, estimates and opinions concerning value are not given with respect to . . . sales and earnings"). Only after substantial prodding from legal

scholars, *see, e. g.*, Kripke, *The SEC, The Accountants, Some Myths and Some Realities*, 45 N.Y.U.L.Rev. 1151 (1970), has this strict dichotomy been rejected. Although the SEC now *permits* disclosure of "projections which are made in good faith and have a reasonable basis, provided that they are presented in an appropriate format and accompanied by information adequate for investors to make their own judgments," SEC, Securities Act Release No. 5699, in [1975–1976] Fed.Sec.L.Rep. (CCH) ¶ 80,461, at 86,202 (April 23, 1976), no company is *required* by the SEC to issue projections. SEC, Securities Act Release No. 5362, in [1972–1973] Fed.Sec.L.Rep. (CCH) ¶ 79,211, at 82,665 (Feb. 2, 1973). Nor has any court ever imposed liability for failure to include projections in a registration statement.[4]

■ As such, if plaintiff's § 11 claim were premised merely upon defendants' failure to make forecasts in the registration statement, this court would have little trouble characterizing that claim as frivolous and requiring plaintiff to post an undertaking. But the complaint alleges that on or before March 23, 1976 "each of the defendants knew or was on notice of and recklessly disregarded facts showing a material decrease in earnings and earnings per share for the first quarter ended April 2, 1976 . . . ." (Complaint, ¶ 25). This court reads the complaint as seeking to impose liability not for the failure to project a decline in earnings, but for the failure to disclose the facts on which any such projection might have been based.

Even so, plaintiff has come forth with little to indicate that she will eventually succeed on the merits of her § 11 claim. Plaintiff's principal attempt to substantiate

---

**3.** This evaluation only concerns the possibility of plaintiff's success on the merits. Thus, factors such as the gross disparity between plaintiff's investment or claimed loss and the total potential class recovery, *Linchuck v. Cooper, supra*, 43 F.R.D. at 385, or the possibility that the bulk of the potential liability or costs of defending the suit may fall on individual, rather than corporate defendants, have no place in the required calculus.

**4.** Liability has been imposed, however, on defendants who make projections without disclosing "any assumptions underlying the projection . . . if their validity is sufficiently in doubt that a reasonable prudent investor, if he knew of the underlying assumptions, might be deterred from crediting the forecast." *Beecher v. Able*, 374 F.Supp. 341, 348 (S.D.N.Y.1974).

her allegations consists of comparisons between Holiday's Form 10–Q for the first quarter of 1976, prepared after that quarter ended, and the March 23 registration statement. In the section of her memorandum in opposition to the motion entitled "Plaintiff's Analysis of the Prospectus—Complaint ¶'s 25 and 26 Substantiated", she merely repeats the unsubstantiated allegation that because the Form 10–Q revealed adverse results for the first quarter, defendants knew or should have known of these results on March 23.

The defendants contend that on March 23, 1976 they had no such information. Analyzing the $.13 decline in earnings in the first quarter of 1976 as compared to the first quarter of 1975, the defendants conclude that $.12, or virtually all of the decline, occurred in March, 1976, the last month of the quarter.[5] Defendants further argue that although Holiday knew its earnings for January and February, 1976 on March 23, it did not know its earnings for March, 1976 on that date because Holiday's Controller did not receive March, 1976 figures from each of its eight divisions until the second week of April (Dismuke affidavit, pp. 9–14). Finally, defendants claim that due to the seasonal nature of Holiday's business and the fact that January and February are the slowest months of the year for its Hospitality and Transportation Groups, the results for those months, or even the first quarter, offer no indication of what a full year's results will be.

Plaintiff disputes defendants' analysis of the first quarter decline and their estimation of its importance as an indication of Holiday's overall performance in a fiscal year. Her principal contention is that Holiday suffered a decline in the first two months of 1976 as compared to the same months in 1975 and that defendants were aware of this on March 23, 1976. Specifically, she argues that if the company's currency translation loss is isolated and factored out of its total net income after tax, Holiday suffered a decline in "operating profit" of $.07 per share in the first two months of 1976 as compared to the same period in 1975 [6] and that this should have been disclosed in the registration statement.

5. Defendants attribute the bulk of the March, 1976 decline to three distinct factors. First, Holiday's subsidiary, TCO Industries, Inc. ("TCO"), owns and operates Delta Steamship Lines, Inc. ("Delta"), a United States flag carrier with a fleet of cargo vessels. In March, 1975, Delta received a $2.5 million non-recurring government subsidy, by which the federal government compensated it for operating expenses in excess of those incurred by its foreign competitors. For accounting purposes, the subsidy payments were treated as a reduction in current expenses and had the effect of increasing Holiday's net income after tax by approximately $.05 per share more than the actual operating income for that month. (Affidavit of Bill J. Dismuke, pp. 6–7). This non-recurring subsidy was specifically noted in the March 23 registration statement. Second, much of Holiday's business is transacted in foreign countries and currencies. The Financial Accounting Standards Board requires that Holiday account in its statement of income on a current basis for changes in the relationship between the dollar and the foreign currencies in which certain of Holiday's assets and liabilities are denominated. See infra. The dollar performed well in March, 1975 and Holiday recognized a "translation gain" of $1.77 million. In March, 1976, however, the dollar suffered a downturn and Holiday incurred a "translation loss" of $.3 million. Holiday calculates that this unfavorable variance of over $2 million resulted in a comparative decline of $.04 per share. (Dismuke affidavit, pp. 7–8). Finally, TCO owns Continental Trailways, Inc. ("Trailways"), the second largest interstate bus system in the United States. Although Trailways' bus operation achieved pre-tax income of $.6 million in March, 1975, it suffered a pre-tax loss of $1.27 million in March, 1976. This variance of $1.87 million resulted, by Holiday's calculation, in an unfavorable after-tax difference in Holiday's comparative 1975–1976 net income for March of $.03 per share.

6. Plaintiff has calculated this figure as follows. Holiday's translation loss for January and February 1975 was $2.1 million, or approximately $.07 per share. Since Holiday's total after-tax net income per share for those two months was zero, plaintiffs argue, Holiday had an "operating profit" of $.07 per share for those two months. Holiday's translation loss for January and February, 1976 was $.28 million, or approximately $.01 per share. Since Holiday's total after-tax net income per share for those two months was a loss of $.01, it had zero "operating profit" for those two months, or a comparative decline of $.07 per share in "operating profit."

■ If a multinational corporation like Holiday were to report its earnings in the manner plaintiff suggests, however, it would clearly violate generally accepted accounting principles. Although the method employed has varied through the years, foreign currency translation has long been required of American companies with branches or subsidiaries operating abroad. *See* Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 8 (1975); Committee on Auditing Procedure of the American Institute of Certified Public Accountants, Accounting Research Bulletin No. 43 (1953). Compliance with generally accepted accounting principles does not necessarily insulate defendants from liability under the federal securities laws. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 121 (S.D.N.Y.1974), *aff'd in part and rev'd in part,* 540 F.2d 27 (2d Cir. 1976). Nevertheless, plaintiff fails to suggest why Holiday should have reported its "operating results" for January and February, 1976 by selectively choosing to exclude its foreign translation results, while including all other "non-operating results", such as general corporate expense and depreciation. In fact, if Holiday had followed plaintiff's suggested method of reporting, its registration statement might well have affirmatively misrepresented its financial state.[7]

■ The true January and February results in 1976—those reflecting both the revenues and expenses of Holiday's operating divisions and the required accounting adjustments—were only $.01 per share below the results for January and February, 1975. On balance, this court determines that, for the purposes of this motion, this omitted information is not material in the sense that "there is a substantial likelihood that a reasonable shareholder would consider it important" in making his investment decision. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Even if allowances are made for the fact that plaintiff has yet to complete discovery, the court determines that plaintiff's § 11 claim is so bereft of factual support as to "border on the frivolous." Defendants' motion for an undertaking is granted. As a condition to continuing her § 11 claim, plaintiff is directed to post an undertaking in the amount of $100,-000 as security for defendants' costs of defending that claim.

### The Remaining Motions

■ All defendants have moved for a stay of any ruling on plaintiff's motion for class action certification pending the determination of their motion for an undertaking. Plaintiff's Rule 23 motion has been effectively stayed while this court considered the merits of the motion for an undertaking. Even if plaintiff fails to post the undertaking, her § 10(b) claim will survive.[8] There is no reason to delay further the decision of the class action motion; all defendants are directed to respond thereto within 20 days of plaintiff's posting of the undertaking or her written notice to all parties and this court of her intent to discontinue her § 11 claim.

Defendants Holiday, Walkem, Wilson, Johnson and McCool have moved to stay all discovery pending the determination of their motion for an undertaking and until such undertaking is furnished. Plaintiff has cross-moved to stay all discovery of plaintiff until after the determination of her class action motion. All discovery concerning matters other than class certification is hereby stayed pending the resolution of the class certification motion.

So Ordered.

---

7. Foreign currency translation is not an insubstantial part of Holiday's financial picture. During the first quarter of 1976, Holiday was required to translate approximately $62.5 million in debt denominated in foreign currency pursuant to generally accepted accounting principles. Thus, even a one percent devaluation of the dollar during that quarter would have affected results of Holiday's operations to the extent of $.625 million. (Reply Affidavit of Bill J. Dismuke, p. 1).

8. The power to require a bond pursuant to § 11(e) does not extend to claims brought pursuant to § 10(b). *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 789 (2d Cir. 1951).