**Joel M. KAHN, Plaintiff,**

v.

**Lawrence A. WIEN, et al., Defendants.**

**No. CV 86–2416 (RJD).**

United States District Court,
E.D. New York.

Feb. 2, 1994.

670

Irving Malchman, Kaufman Malchman Kaufmann & Kirby, New York City, for plaintiff.

Eli R. Mattioli, Wien, Malkin & Bettex, New York City, for defendants.

*MEMORANDUM AND ORDER*

DEARIE, District Judge.

Plaintiff, a record and beneficial holder of participation interests in a real estate joint venture, alleges that defendants' letter soliciting consent to a modification of the net lease on a building owned by the joint venture contained material omissions and misrepresentations in violation of section 14(a) of the Securities Exchange Act of 1934[1] and Rule 14a–9 promulgated thereunder.[2] Plaintiff also claims that defendants, as agents and attorneys for the joint venture, breached their fiduciary duties under state law.

Defendants move for judgment on the pleadings or alternatively for summary judgment. Because discovery has been conducted and because both sides have largely gone outside of the pleadings with regard to this motion, defendants' application is viewed by the Court as one for summary judgment. For the reasons below, the Court grants defendants' motion for summary judgment with respect to the federal securities claim. The state law claim of breach of fiduciary duty is dismissed for lack of subject matter jurisdiction.

## BACKGROUND

Two Hundred Fifty West 57th Street Associates was organized by ten individuals as a joint venture ("Joint Venture") pursuant to an agreement of May 25, 1953. The ten joint venture partners made a public offering of their interests on or about September 30, 1953. Following the public offering, the ten individuals retained a nominal ownership of the participation interests held by their respective investor groups and served as agents for the participation holders. As of 1985, the ten original joint venturers had all either died or resigned, and the Joint Venture has since been represented by three agents, defendants Lawrence A. Wien,[3] Peter L. Malkin, and Alvin Silverman (collectively, "the Agents"). Plaintiff is one of 478 individuals ("Investors") who hold participation units in the Joint Venture.

The Joint Venture owns the Fisk Building, located at 250 West 57th Street in Manhat-

---

**1.** Section 14(a) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

15 U.S.C. § 78n(a) (1981).

**2.** Rule 14a–9 of the Securities Exchange Act of 1934 provides:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9 (1993).

**3.** Mr. Wien died on December 10, 1988. By stipulation pursuant to Rule 25(a) of the Federal Rules of Civil Procedure, Mr. Wien's executors have been substituted as defendant in this case.

tan. On September 30, 1953, pursuant to a net lease, the Joint Venture leased the Fisk Building ("Building") to Fisk Building Associates ("Net Lessee"). The net lease provided for a term of twenty-five years, with an option to renew for an additional twenty-five year term. The Net Lessee exercised its renewal option in 1978, thereby extending the expiration date of the net lease to September 20, 2003.

The net lease provided that the Net Lessee was to pay the Joint Venture three levels of rent: (1) annual basic rent (consisting of mortgage, charges and a supervisory fees); (2) primary overage rent (consisting of the net operating profit of the Building after deducting annual basic rent, and up to a maximum of $414,000); and (3) secondary overage rent (consisting of one-half of the net operating profit of the Building after deducting annual basic rent and primary overage rent). The other one-half of secondary overage rent was payable to the Net Lessee.

Under the net lease, the Net Lessee had the responsibility to "keep in good repair and ... renew, rebuild and replace, as necessary" the property. At the end of the lease, the Net Lessee was required to surrender the property "in good condition and repair, with due allowance for reasonable wear and tear." In addition, the net lease provided that the Net Lessee "may make alternations, additions and improvements to the demised premises, without the written consent of the Landlord," unless a substantial portion of the building would be demolished or unless any single alteration, addition, or improvement, would cost more than $100,000.

Substantive modifications to the net lease could be made only with the approval of at least 75% of the ownership of the Fisk Building. The net lease has been modified three times. The first modification agreement, dated June 12, 1961, provided for an increase in the mortgage to finance certain improvements. The second modification agreement, dated June 10, 1965, provided for additional improvements, to be financed equally by the Joint Venture and the Net Lessee. The third modification agreement, dated May 1, 1975, financed another program of improvements by another increase in the mortgage.

By letter of April 22, 1985 ("Consent Letter"), defendants solicited consent to a fourth modification of the net lease.[4] The Consent Letter advised that major improvements needed to be made to the Building in order to maintain its competitive value and profitability, but that the Net Lessee did not find it "economically justifiable" to undertake those improvements unless it was granted an extension of the net lease. Defendants solicited the Investors' consent to modify the net lease to provide for four additional renewal options of 25 years each, in exchange for an increase in the ceiling of primary overage rent to $752,000, thereby increasing the Investors' maximum investment return from 11.5% to 20%, and in return for the Net Lessee's agreement to complete at least $2,500,000 of improvements. The improvements would be financed out of operating cash flow.

The Consent Letter also disclosed that because the defendant Agents owned 3.33% of the participations of the Joint Venture and because two of the Agents together also owned 55% of the interests in the Net Lessee, a potential conflict of interest existed. In addition, the Consent Letter noted that because the law firm of Wien, Malkin & Bettex served as counsel to both the Joint Venture and the Net Lessee, it also could be deemed to have a conflict of interest. For these reasons, the Consent Letter explained, the Agents retained the independent real estate firm of Cushman & Wakefield to review the proposed modification of the net lease. The Consent Letter reported that Cushman & Wakefield had concluded that the transaction was "fair and reasonable." Recent financial statements of the Joint Venture were attached to and referenced in the Consent Letter.

Approximately 80% of the Investors gave their consent to the proposed modification of

---

4. It is not contested that the Consent Letter functioned as a proxy solicitation and is therefore subject to the requirements of the securities laws.

the net lease. Plaintiff did not respond to the Consent Letter.[5]

## DISCUSSION

Plaintiff alleges that the Consent Letter was materially misleading in violation of section 14(a) and Rule 14a–9 of the Securities Exchange Act of 1934. While plaintiff does not contest that the proposed improvements were necessary to maintain the competitive value and profitability of the Building, plaintiff alleges that because certain material information was omitted from it, the Consent Letter disguised the unfairness of the proposed modification. Specifically, in paragraph 41 of the Complaint, plaintiff claims essentially that the Consent Letter omitted to state:

(1) the amount of defendants' investment in the Net Lessee (which was "completely nominal relative to the $3,600,000 in outstanding participation interests in the Joint Venture"); (Complaint, ¶ 41(a));

(2) that the Net Lessee was obligated under the net lease to make repairs and improvements to maintain the Building's competitive position and thus was not entitled to additional consideration to do the same; (Complaint, ¶ 41(b));

(3) that the value of the extension to the Net Lessee substantially exceeded the present value of the potential increase in primary overage rent to the Investors; (Complaint, ¶ 41(c));

(4) that if the Building or the air rights on that realty were sold, millions of dollars of the Joint Venture's interest in the property would be transferred to the Net Lessee due to the extension; (Complaint, ¶ 41(d));

(5) that by agreeing to the extension, the Joint Venture was surrendering the present value of the millions of dollars that its ownership of the Building would have been worth had the net lease terminated in 2003; (Complaint, ¶ 41(e));

(6) that the extension increased the value of the net lease to the Net Lessee with no corresponding value to the Joint Venture; (Complaint, ¶ 41(f));

(7) that alternative ways of financing the improvements which were more financially advantageous to the Joint Venture existed, and what those alternatives were; (Complaint, ¶ 41(h));

(8) that it was the fiduciary duty of defendants, both the Agents and the law firm of Wien, Malkin, & Bettex, to negotiate on behalf of the Joint Venture; (Complaint, ¶ 41(i));

(9) that the value of the Building, including the underlying property and air rights, had and could reasonably be anticipated to increase substantially, and that by granting the extension, the Joint Venture surrendered a substantial part of that value; (Complaint, ¶ 41(j));

(10) that the Net Lessee had great financial incentive to improve the Building to maintain its competitive position independent of the extension; (Complaint, ¶ 41(k));

(11) that the secondary overage rent for the Joint Venture's fiscal year ending September 30, 1984 was $2,493,969 instead of the erroneous amount given in the Consent Letter of $1,709,300; (Complaint, ¶ 41(*l*));

(12) that the Agents and Wien, Malin & Bettex were defendants in actions on claims of violation of federal securities laws and breaches of fiduciary duties; (Complaint, ¶ 41(m));

(13) that the rent payable by the Net Lessee under the proposed modification of the net lease was substantially below the fair market rent being paid for comparable buildings in New York City; (Complaint, ¶ 41(n)); and

(14) that the opinion of Cushman & Wakefield disguised the unfairness of the proposed modification by omitting to state the purported facts (3)–(6) above. (Complaint, ¶ 41(g)).

5. It is not contested that plaintiff, a record and beneficial owner of participation interests in the Joint Venture, has standing to bring the present action despite not having responded to the proxy solicitation. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (the injury which shareholder suffers from a corporate action based on a deceptive proxy solicitation flows not from the damage inflicted directly on that individual shareholder, but from the damage done to the corporation); *Cowin v. Bresler,* 741 F.2d 410, 427 (D.C.Cir.1984).

In addition, to its federal securities claim, plaintiff asserts that defendants breached their fiduciary duties under state law and seeks punitive damages.

## I. Standard for Summary Judgment

Summary judgment shall be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Movants may discharge their burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 326, 106 S.Ct. at 2554. The evidence and all factual inferences, however, must be viewed in the light most favorable to the nonmovant. *Beacon Enterprise Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983).

## II. Section 14(a) Liability

Section 14(a) prohibits any proxy solicitation for a publicly registered security that contravenes the securities laws. 15 U.S.C. § 78n(a). Rule 14a–9 provides that no proxy solicitation may contain false or misleading statements or omissions with respect to any material fact. 17 C.F.R. § 240.14(a)–9.

### A. Standard of Materiality

The Supreme Court has held that an omitted fact is "material" for purposes of Rule 14a–9:

> if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have

> assumed actual significance in the deliberations of the reasonable shareholder.... [or] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.

*TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In so holding, the Court expressly rejected defining a material fact as one which a reasonable shareholder *might* consider important, finding such a formulation " 'too suggestive of mere possibility, however unlikely.' " *Id.* at 449, 96 S.Ct. at 2132 (quoting *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1302 (2d Cir.1973)).

In determining the appropriateness of summary judgment on the issue of materiality in a Rule 14a–9 action:

> [W]e must bear in mind that the underlying facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133. Because the issue of materiality is a mixed question of law and fact, it may be resolved as a matter of law by summary judgment "[o]nly if the established omissions are 'so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality.' " *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133 (quoting *John Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)); *Mendell v. Greenberg,* 927 F.2d 667 (2d Cir.), *amended on other grounds,* 938 F.2d 1528 (2d Cir.1990).

### B. Materiality of the Alleged Omissions

Essentially, plaintiff alleges that, by omitting various material facts, the Consent Letter disguised the unfairness of the transaction and misled the Investors into not seeking more favorable alternatives. The materi-

ality of the purported omissions is discussed below.

### 1) *The Right to Receive Improvements at No Extra Cost*

■ Plaintiff begins by alleging that the Joint Venture should not have had to pay for the proposed improvements to the Building because the Net Lessee was already obligated under the net lease to make those improvements. (Complaint ¶ 41(b)). The parties do not dispute that the improvements contemplated fall within the general category of capital improvements, rather than general maintenance. These improvements involved renovation of the Building's public areas including corridors, restrooms, lobby, storefronts, sidewalks, elevators, improvement of air conditioning, replacement of existing windows with energy efficient windows, and re-arrangement of tenant space. (Consent Letter at 5). The Court finds no support for the allegation that the Net Lessee was obligated to make these improvements under the terms of the net lease or the prior modification agreements of the net lease.

The New York courts "have repeatedly held that a tenant shall not be required to make extraordinary repairs or structural changes of a substantial nature ... unless there was a clear expression of such intent by the parties." *Nevins v. Fine Cars, Inc.,* 36 Misc.2d 451, 233 N.Y.S.2d 74, 76 (N.Y.Civ. Ct.1962). The net lease contains this covenant to repair:

> [The Net Lessee], at its sole cost and expense, shall keep in good repair and renew, rebuild and replace, as necessary, the building located on the demised premises, the sidewalks adjacent thereto, and all equipment, fixtures and appurtenances used in or about the building.

(Net Lease, ¶ 4). In addition, the Net Lessee must maintain the property "in good condition and repair, with due allowance for reasonable wear and tear." *Id.*

This covenant is largely one for ordinary repairs. By agreeing to keep the property in "good condition" with "allowance for reason-able wear and tear," the Net Lessee is under no obligation to restore the property's condition "where the decay is so extensive as to render repair, in the ordinary sense, impossible." *Street v. Central Brewing Co.,* 101 A.D. 3, 91 N.Y.S. 547, 548 (N.Y.App.Div. 1905). This covenant does however, impose a somewhat broader obligation than the duty to make ordinary repairs, in that it also contains the term "renew." Plaintiff argues that the Net Lessee's obligation to "renew" includes the duty to make the proposed improvements. (P's Mem.Opp.Summ.J. at 12).

The net lease must "be interpreted to avoid inconsistencies and to give meaning to all of the terms contained therein." *See First Fed. Sav. Loan Ass'n of Rochester v. Minkoff,* 176 A.D.2d 1049, 575 N.Y.S.2d 197, 199 (N.Y.App.Div.1991). Elsewhere, the net lease explicitly addresses the question of improvements, stating that the Net Lessee *"may* make alternations, additions and improvements to the demised premises, without the written consent of the Landlord," unless a substantial portion of the building would be demolished or unless any single alteration, addition, or improvement, would cost more than $100,000. (Net Lease at ¶ 20) (emphasis added). This clause imposes no obligation on the Net Lessee to make improvements, but simply provides the Net Lessee with limited power to make certain improvements, should it choose to do so, without the written consent of the landlord. To read this clause consistently with the covenant to repair, one must interpret the obligation to "renew" as falling short of making "improvements" to the Building.

In further support of his argument, plaintiff embraces language in the third modification agreement, that provides: "In the event that [the Net Lessee] shall borrow funds with which to make any capital improvement," the Net Lessee has the right to expense the payments of principal and interest on such loans. (Modification Agreement of May 1, 1985, at 3–4) (Exhibit G).[6] This language hardly imposes on the Net Lessee

---

**6.** "Exhibits" refer to the Appendix of Exhibits submitted on behalf of defendants in support of the affidavit of Eli R. Mattioli.

the responsibility to make improvements to the Building. The modification simply provides that *if* the Net Lessee chooses to undertake those improvements and *if* it borrows funds to finance the same, the borrowed funds may be expensed.

Because nothing in the terms of the net lease or prior modification agreements indicates that the Net Lessee has any obligation to make improvements to the Building, plaintiff will not be heard to complain about the Consent Letter on this basis.

### 2) *Disparity of Return*

■ The Consent Letter was misleading, plaintiff alleges, because it did not state that the proposed modification would benefit the Net Lessee significantly more than it would the Joint Venture.

Plaintiff argues that the Consent Letter should have revealed that the extension of the net lease increased the value of the Net Lessee's interest in the net lease while giving "no corresponding value" to the Joint Venture. (Complaint, ¶ 41(f)). Plaintiff also claims that the Consent Letter should have disclosed certain information as to the comparable value of the proposed modification to both sides: (i) that the value to the Net Lessee of receiving the extension of the net lease substantially exceeded the present value of the increase of the primary overage rent to be paid to the Joint Venture; (Complaint, ¶ 41(c)); (ii) that if the Building or the air rights on that realty were sold, millions of dollars of the Joint Venture's interest in the property would be transferred to the Net Lessee due to the extension; (Complaint, ¶ 41(d)); (iii) that by agreeing to the extension, the Joint Venture would surrender the present value of the millions of dollars that its ownership of the Building would have been worth had the net lease terminated in 2003; (Complaint, ¶ 41(e)); and (iv) that the value of the Building, including the underlying property and air rights, had and could reasonably be anticipated to increase substantially, and that by granting the extension, the Joint Venture surrendered a substantial part of that value. (Complaint, ¶ 41(j)).

■ Plaintiff's litany of largely self-evident facts essentially challenges the Consent Letter on the grounds that it failed to provide material information about the value of the proposed extension in the context of plaintiff's overall investment. This criticism ignores the fact that considerable financial detail was included in the financial statements attached to the Consent Letter. The Second Circuit has recognized that:

> The "total mix" of information may include data sent to shareholders by a company in addition to its proxy materials, *see e.g., Ash v. LFE Corp.,* 525 F.2d 215, 219 (3d Cir.1975) (proxy statements need not "duplicate the financial data furnished to shareholders in the corporation's annual reports"), as well as other information "reasonably available to the shareholders."

*United Paperworkers Int'l Union v. International Paper Co.,* 985 F.2d 1190, 1198 (2d Cir.1993) (quoting *Rodman v. Grant Foundation,* 608 F.2d 64, 70 (2d Cir.1979). The financial statements attached to the Consent Letter, from which the reasonable investor could perform the simple mathematical calculations necessary to determine the present and future values of the proposed transaction to both parties, *see Wallerstein v. Primerica Corp.,* 701 F.Supp. 393 (E.D.N.Y.1988), must be considered part of the "total mix" of information available to the Investors.

■ Furthermore, these alleged omissions from the Consent Letter were largely self-evident facts of which a reasonable investor would not need to be informed and therefore are not material omissions under Rule 14a–9. *See Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978). The absence of any specific recitation or reference does not necessarily constitute a material omission. One could always articulate something that was omitted from a solicitation or offering, couch it in impressive financial jargon, and declare it to be material. Material omissions arise from the absence of pivotal information affecting the nature and character of a specific investment opportunity, and the promises or threats of risk and return. It goes without saying that the net lease would expire without an extension. A reasonable investor who would agree to extend the term of a lease

would know that there will be opportunity costs in terms of the value for which the property could have been sold or re-leased on possibly more favorable terms had the extension not been granted. While solicitors of proxies cannot expect the average investor to be aware of "overtones [that] might have been picked up by the sensitive antennae of investment analysts," they are also " 'not required to address [the] stockholders as if they were children in kindergarten.' " *Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281, 1302 (2d Cir.1973) (Friendly, J.) (quoting *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y.1967)).

 In addition, proxy solicitations need only provide the full objective facts upon which investors can make their own judgments as to value, and need not, and most often should not, "embellish [the facts] with speculative financial predictions." *Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir.1979). *See also Wallerstein v. Primerica Corp.*, 701 F.Supp. 393, 396 (E.D.N.Y.1988); *Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 962 n. 14 (S.D.N.Y.1983), *aff'd*, 730 F.2d 910 (2d Cir.1984).[7] Although valuation statements, once made, must be accurate, *see Wilson v. Great American Indus., Inc.*, 855 F.2d 987, 994–95 (2d Cir.1988), the omission of valuations, particularly those that are not prepared by a qualified expert, is not improper. *See South Coast Serv. Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265, 1272 (9th Cir.1982).

 Plaintiff does argue that the Consent Letter failed to provide even the objective facts necessary for the Investors to make an intelligent valuation of the proposed modification, because it misstated the secondary overage rent for the Joint Venture's fiscal year ending September 30, 1984 as $1,709,-300 instead of the correct amount of $2,493,-969. (Complaint, ¶ 41(*l*)). It is not contested that this erroneous statement appeared in the Consent Letter, and it is clear beyond question that the inaccuracy was the product

of inadvertent error and not the effort to mislead. (Def's Mem.Supp.Summ.J. at 45–46). Nevertheless, because the distributions of the secondary overage rent to each Investor were listed correctly in the same sentence, and because the correct figure for the total secondary overage rent appeared in Note 3 to the financial statements, the Court concludes that there was "no conceivable danger that the reasonable shareholder would fail to realize the correlation and overall import of the various facts interspersed throughout the proxy." *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 516 (D.C.Cir.1986). Therefore, contrary to plaintiff's assertion, the correct figure for the secondary overage rent was not a "buried fact." *Id.*

Moreover, to the extent that the secondary overage rent would be significant to an Investor, it was most likely to have been in the context of calculating the prospective return of the proposed modification, and that information was accurately and clearly stated in the Consent Letter. (Consent Letter at 2, 7–9). Taking into account the total mix of information available, the Court concludes that the isolated misstatement would not have affected the deliberations of the reasonable investor. Therefore, the misstatement of secondary overage rent was not material.

 Finally, the plaintiff alleges that the Consent Letter omitted to state that the rent payable by the Net Lessee under the proposed modification of the net lease was substantially below the fair market rent for comparable buildings in New York City. (Complaint, ¶ 41(n)). The Court disagrees with plaintiff's suggestion that such a statement should have been included in the Consent Letter. A proxy statement need not negatively characterize all the facts that are disclosed or expressly verbalize all adverse inferences from those facts. *See Samuel Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066, 1079 (S.D.N.Y.1987); *Klamberg v. Roth*, 473 F.Supp. 544, 551 (S.D.N.Y.

---

7. As defendants note, while the courts have recently become more permissive about *allowing* financial projections to be included in proxy solicitations, they have not changed their view that such disclosure is not *required*. *See Walker v.*
*Action Indus., Inc.*, 802 F.2d 703, 710 (4th Cir. 1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); *Straus v. Holiday Inns, Inc.*, 460 F.Supp. 729, 734 (S.D.N.Y.1978).

1979). *See also Goldberg v. Meridor*, 567 F.2d 209, 218 n. 8 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

Because much of the valuation information that was "omitted" from the Consent Letter was available from the attached financial statements or self-evident, because valuation statements are not required in proxy statements, and because the Consent Letter was not required to negatively characterize the proposed modification, the allegations and available evidence pertaining to paragraphs 41(c)-(e), (j), (*l*), and (n) of the Complaint do not support a claim under Rule 14a–9.

### 3) *Alternative Methods*

■ Plaintiff also faults the Consent Letter for failing to identify alternative methods of financing the improvements. (Complaint, ¶ 41(h)). Furthermore, plaintiff implies, by not disclosing the fact that the Net Lessee independently had great financial incentive to improve the Building, (Complaint, ¶ 41(k)), the Consent Letter hid from the Investors the possibility of negotiating a more favorable deal with the Net Lessee.

■ The securities laws do not require that a proxy solicitation discuss all of the arguments against, or all of the alternatives to, the proposed course of action. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978); *Abramson v. Nytronics, Inc.*, 312 F.Supp. 519, 524 (S.D.N.Y.1970); *Umbriac v. Kaiser*, 467 F.Supp. 548, 553 (D.Nev. 1979) ("management is not required to discuss the panoply of possible alternatives to the course of action it is proposing, absent perhaps some suggestion that the route not chosen was so well recognized and legally sound that the failure to pursue it demands consideration."). Accordingly, paragraphs 41(h) and (k) of the Complaint do not support a claim under Rule 14a–9.

### 4) *Cushman & Wakefield Opinion*

■ In an essentially repetitious attack, plaintiff challenges the Cushman & Wakefield opinion as itself materially misleading because it did not reflect the information plaintiff claims should have been included in the Consent Letter. Because the claimed deficiencies are not material, the Cushman & Wakefield opinion is not vulnerable to attack on these grounds. Although an opinion as to the fairness of a proposed course of action may be actionable if it is knowingly false when made, *Virginia Bankshares, Inc. v. Sandberg*, — U.S. —, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), plaintiff makes no such allegation in the Complaint, and neither the facts as pleaded nor the available evidence would support such an inference. Indeed, although Cushman & Wakefield was originally named as a defendant in this matter, the parties stipulated to dismissal of the action as against Cushman & Wakefield on October 13, 1989.

### 5) *Conflicts of Interest*

■ The Complaint alleges that the Consent Letter omitted to state the amount that the Agents had invested in the Net Lessee. (Complaint, ¶ 41(a)). Plaintiff also faults the Consent Letter for failing to state that defendants had a fiduciary duty to negotiate alternatives more favorable to the Joint Venture. (Complaint, ¶ 41(i)). Both of these allegations seem to imply that the Consent Letter violated Rule 14a–9 by failing to disclose defendants' duties to the Joint Venture and their conflicts of interest. In fact, however, the Consent Letter does disclose this information.

■ Defendants contend that these allegations are an attempt to turn a state fiduciary duty claim into a federal securities law claim. (Def.'s Mem.Supp.Summ.J.). This argument overlooks the fact, however, that the failure to disclose even potential conflicts of interest may be actionable under federal securities law, independent of whether the undisclosed facts might also support a claim for an actual breach of fiduciary duty under state law. *See Wilson v. Great American Indus., Inc.*, 855 F.2d 987, 993–94 (2d Cir.1988); *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 516 (D.C.Cir. 1986). Potential conflicts of interest, such as where a corporate director has a personal stake in a corporate decision or has a special relationship with a party whose interests may be adverse to those of the shareholders,

must be disclosed so that shareholders are alerted to the possible impairment of the director's judgment and know to put the director's recommendations in perspective. *See Kas v. Financial General Bankshares,* 796 F.2d at 513.

The Consent Letter expressly discloses that the Agents own 3.33% of the participations of the Joint Venture and that two of the Agents together own 55% of the interests in the Net Lessee. (Consent Letter at 10). The Consent Letter explicitly states that, because of these relationships, the Agents "could be deemed to have potential conflicts of interest" in representing the interests of the Joint Venture with respect to the proposed modification of the net lease. *Id.* In addition, the Consent Letter notes that because the law firm of Wien, Malkin & Bettex served as counsel to both the Joint Venture and the Net Lessee, it also could be deemed to have a conflict of interest. *Id.*

Because the Consent Letter clearly highlights the potential conflicts of interest, paragraphs 41(a) and (i) of the Complaint do not support a claim under Rule 14a–9.

### 6) Pending Litigation

■ Finally, plaintiff alleges that the Consent Letter failed to disclose that the Agents and Wien, Malkin & Bettex were then defendants in pending actions alleging violations of federal securities laws and breaches of fiduciary duties; (Complaint, ¶ 41(m)).

Although plaintiff does not specify which litigations should have been disclosed in the Consent Letter, there were, at the time the Consent Letter was distributed, two pending cases involving the defendants. The first action, *Koppel v. Wien, Lane, & Malkin,* was brought in New York Supreme Court and alleged breach of fiduciary duty, self-dealing, conflicts of interest, and contractual causes of action under New York law with respect to the sale of a building located at 120 Broadway. (Def.'s Mem.Supp.Summ.J. at 33). The case settled in 1988, with the express acknowledgement by the plaintiff that there

had been no fraud or breach of fiduciary duty on the part of the defendants. *Id.* at n.*. The second action, *Kahn v. Wien,* was brought by the brother of the plaintiff in the present case, in the Southern District of New York with respect to the Berkley Building. *Id.* at 33. That action settled on April 26, 1985, four days after the proxy solicitation at issue in the present case was sent to the Investors, and the plaintiff in that case acknowledged that there had been no fraud, violation of the securities laws, or breach of fiduciary duty.

The Second Circuit has held that the disclosure of unproven allegations is not required in proxy solicitations. *Ciresi v. Citicorp,* 782 F.Supp. 819, 823 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992). Furthermore, the fact that SEC regulations require that all pending criminal proceedings be disclosed in proxy solicitations, but do not require corresponding disclosure of pending civil actions "strongly suggests that regardless of how serious they may appear on their face, unadjudicated allegations in a pending civil action ... should not be material." *GAF Corp. v. Heyman,* 724 F.2d 727, 739–40 (2d Cir.1983). The Second Circuit has cautioned against placing "much stock in the bald, untested allegations in a civil complaint" in "a society as litigious as ours, where plaintiffs are permitted great latitude in their pleadings ..." *Id.* Because the two earlier actions consisted of unproven allegations at the time of the Consent Letter, they were not material facts that were required to be included in the proxy solicitations.

For all of the foregoing reasons, the Court grants defendants' motion for summary judgment on the Rule 14a–9 claim, as enumerated in paragraph 41 of the Complaint.[8]

### III. Breach of Fiduciary Duties Under State Law

■ Plaintiff also charges defendants with breach of their fiduciary duties under state law. Because the Court has granted summary judgment in favor of defendants on the federal claim, there is no basis for pen-

---

8. Because the lack of materiality is dispositive in this case, the Court does not reach the issue of

whether the issue of defendants' scienter was adequately pleaded.

dent jurisdiction,[9] *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), and the state claim must be dismissed as well. *See Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990); *Freer v. Mayer,* 796 F.Supp. 89, 92 (S.D.N.Y.1992); 28 U.S.C. § 1367 (1993) (governing actions commenced after December 1, 1990).

## CONCLUSION

Defendants' motion for summary judgment is granted with respect to the claim for violation of section 14(a) and Rule 14a–9 of the Securities Exchange Act of 1934. The state claim for breach of fiduciary duty is dismissed for lack of subject matter jurisdiction.

The Clerk of the Court is directed to enter judgment for defendants in accordance with this Memorandum and Order.

SO ORDERED.

---

**9.** Under the doctrine of "pendent-claim jurisdiction," a federal court has the constitutional power to adjudicate the non-federal portion of a dispute against a defendant who is already subject to the court's jurisdiction on the primary federal claim, where the state claims "derive from a common nucleus of operative fact" as the federal claims.